**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **NUVASIVE, INC.,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) **Case No. 21-cv-11644-DJC** |
|  | ) |
| **RIVAL MEDICAL, LLC, TIMOTHY DAY and MONIQUE DAY,** | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

**MEMORANDUM AND ORDER**

CASPER, J.                                                                      **February 27, 2024**

**I.      Introduction**

Plaintiff NuVasive, Inc. ("NuVasive") has filed this lawsuit against Defendants Rival Medical, LLC ("Rival"), Timothy Day ("Day") and Monique Day ("Ms. Day") (collectively, the "Defendants") seeking to pierce Rival's corporate veil (Count I), establish that Day is Rival's alter ego (Count II), and obtain a judgment declaring that Rival fraudulently transferred its assets and property in violation of Mass. Gen. L. c. 109A, § 1 *et seq*. (Count III).  D. 1.  Defendants moved for summary judgment on all counts.  D. 48.  NuVasive filed a motion for partial summary judgment on Counts I and II, D. 76, a motion for sanctions for spoliation, D. 78.  For the reasons stated below, the Court DENIES Defendants' motion for summary judgment and ALLOWS NuVasive's motion for partial summary judgment.  The Court also DENIES the sanctions motion in part and ALLOWS it in part.

1

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).  "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn."  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).  "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact."  Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation mark omitted).

## III.     Factual Background

The following facts are undisputed unless otherwise noted and are drawn from the parties' statements of facts, briefing, and accompanying documents.[1]

---

[1] Defendants included a concise statement of material facts in their motion for summary judgment, D. 48, and NuVasive responded to those alleged facts that it disputes, citing Fed. R. Civ. P. 56(c)

NuVasive obtained a monetary judgment against Rival on December 8, 2020 in the amount of $591,181.00 in an arbitration proceeding (the "Arbitration Award").  D. 48 at 1; D. 1-2 at 7. NuVasive obtained a judgment confirming the Arbitration Award from this Court with prejudgment interest for a total of $617,485.04 with post-judgment interest to be incurred.  D. 48 at 1; D. 1-3.  This litigation arises out of Rival's failure to satisfy the Arbitration Award and NuVasive seeking to collect it from the Days.  D. 1 at 11.  NuVasive and Defendants previously have been engaged in related litigation, including NuVasive, Inc. v. Day, No. 19-cv-10800-DJC (D. Mass.) (the "Related Litigation").

### A.    LLC Formation and Corporate Formalities

Rival Medical, originally Goodday Medical, LLC ("Goodday"), was formed in March 2013 with the purpose of selling and distributing medical devices to hospitals in Massachusetts. D. 48 at 2; D. 48-1.  On February 13, 2018, Goodday changed its name to Rival.  D. 48 at 3; D. 48-3.[2]  Day capitalized Rival in January 2019 with a $15,000 investment.  D. 48 at 12; D. 48-10; D. 53 at 11.

Ms. Day was identified as the manager of Rival at its formation and throughout its existence.  D. 48-1; D. 48-2; D. 48-3.  Rival was solely owned by Day, and he was the only member.  D. 48 at 4, 7, 11, 12-13, 15.  As sole member and owner, Day controlled the affairs of Rival, including making decisions on behalf of the company.  D. 48 at 10-11; D. 53 at 5.  Day testified that he does not know if Rival had an operating agreement or bylaws or whether it ever

---

and Local Rule 56.1.  Id.  Defendants, however, did not respond to NuVasive's statement of additional disputed facts, D. 54 at 2 et seq. ¶¶ 1-29 or the concise statement of material facts in NuVasive's motion for summary judgment which incorporated same, D. 77 at 2 & n.2; D. 84 at 1-2, and, accordingly, these facts are deemed undisputed.  Caban Hernandez v. Phillip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007).

[2]Accordingly, the Court will refer to this entity as Rival throughout this Memorandum and Order.

held a members meeting.  D. 53 at 14; D. 53-11 at 10-11; D. 54 ¶ 27.  Day also could not recall if he voted on issues involving Rival or if Rival ever took action by written consent.  D. 53 at 15; D. 53-11 at 11.

Rival failed to file tax returns between 2013 and 2016, D. 54 at 2 ¶ 2, but it did so between 2016 and 2019.  D. 48 at 4; D. 54 at 2 ¶ 2; D. 48-5.  Rival maintained a separate business bank account and a separate business credit card, D. 48 at 4; D. 54 at 2 ¶¶ 3-4, but records reveal that the Days used some of its funds for personal use.  D. 48 at 4; D. 54 at 2 ¶ 4; D. 48-8; D. 57 at 6; D. 54 at 3 ¶ 8.  It employed no less than fifteen employees, including Day, D. 48 at 4; D. 54 at 2 ¶ 5; D. 48-9; D. 57 at 5, but Rival had insufficient funds to pay the monies due its staff by the time Rival stop performing services for NuVasive.  D. 54 at 6 ¶ 25.  Lisa Day, Day's mother, was on Rival's payroll and received a salary.  D. 53 at 17 n.11; D. 53-11 at 68.  She did "some bookkeeping" for Rival, but there is no record of such bookkeeping and Day does not recall if she was on payroll solely for purposes of being on its insurance plan.  D. 53 at 17 n.11; D. 53-11 at 27-28.

### B.   Relationship with Alphatec

In 2016 and 2017, Rival worked with SP2 Medical, LLC d/b/a Magellan Medical ("Magellan"), a NuVasive distributor at the time.  D. 53 at 7; D. 53-13.  Magellan paid Rival its commissions directly into the Days' personal checking account.  D. 53 at 7; D. 53-14; D. 54 ¶ 9. In 2017, Day became frustrated with Magellan and was considering moving elsewhere.  D. 77 at 5; D. 77-5 at 5-6.  He entered conversations with other companies, including Alphatec.  D. 77 at 5; D. 77-5 at 4-5.  Day ultimately decided to continue selling NuVasive products, at least in part, because NuVasive separated with Magellan and agreed to award Day the distributorship for that sales territory.  D. 77 at 5; D. 77-5 at 6.  On January 1, 2018, Day became a "territory manager"

4

for NuVasive.  D. 77 at 5; D. 77-5 at 4.  Nonetheless, Day continued his discussions with Alphatec and its Chief Executive Officer, Patrick Miles ("Miles"). D. 77 at 5-6; D. 77-5 at 9, 17.

On January 1, 2019, Rival and NuVasive entered into a distributorship agreement (the "Distributorship Agreement") for the sale and distribution of medical devices in and around the Boston area.  D. 48 at 3; D. 48-4.  The Distributorship Agreement included non-compete and non-solicitation provisions.  D. 48-4 at 8.  In February 2019, Day reached back out to Miles and Alphatec regarding employment there.  D. 77-5 at 17-18, 21.  Notably, as part of the "transition process," Miles identified several action steps to discuss, including Day's resignation from NuVasive, Day's non-compete obligations to NuVasive and legal "expectations" and indemnification. D. 77 at 6; D. 77-5 at 21.

Day traveled to California March 21-22, 2019 with Adam Richard ("Richard"), a Rival salesperson, to dine with Miles, D. 77 at 6-7; D. 77-5 at 19, 25, resulting in a "handshake deal" between Miles and Day.  D. 77 at 7; D. 77-5 at 22.

### C. <u>Breach of Distributorship Agreement</u>

The parties dispute the exact date that the Distributorship Agreement was terminated.  D. 48 at 3; D. 54 at 1 ¶ 1.  However, they agree that Rival stopped performing services for NuVasive no later than April 1, 2019.  D. 48 at 3; D. 53 at 13.  NuVasive withheld payment of commissions, per the Distribution Agreement, when Rival stopped performing services.  D. 53 at 13; D. 53-12 at 8-9.  Rival did not have sufficient funds to pay its salespersons the salaries and commissions earned when it stopped performing services for NuVasive.  D. 53 at 12; D. 53-12 at 8; D. 54 ¶ 25.  Following Rival's separation from NuVasive, Day used his Rival email address to negotiate a sale of Alphatec products.  D. 53 at 7; D. 53-11 at 107; D. 54 ¶ 10.

On May 6, 2019, Day emailed his accountant "to set up a new business," which should "be done in the same manner as Rival medical," with the purpose of "selling and disrupting [sic]

medical products." D. 53-20.  By May 9, 2019, his new LLC, Northeast Innovative Solutions LLC d/b/a Maverick Medical ("Maverick") was set up.  D. 53 at 15; D. 53-11 at 5; see D. 53-18; D. 53-19.  Alphatec is one of the companies with which Maverick contracts.  D. 53-11 at 6.  Rival was formally dissolved by the Massachusetts Secretary of the Commonwealth on June 30, 2021.  D. 48 at 3; D. 48-3.

### D. **Intermingling of Funds between Rival and Day**

#### *1. Use of Rival's Jet Blue Credit Card*

The Days used Rival's Jet Blue Credit Card for personal expenses.  D. 53 at 9.  For one example, on January 21, 2019, Day charged $2,706.13 to the credit card for a hotel stay in Florida.  D. 53 at 9; D. 53-11 at 86; D. 54 ¶ 13.  He does not recall what business, if any, Rival may have been conducting.  D. 53-12 at 104.  Prior to Rival's separation from NuVasive, Day also made other charges to Rival's Jet Blue Card in February to March 2019.  D. 53 at 9; D. 53-11 at 91-92; D. 54 ¶ 14.  For other examples, on February 12, 2019, Ms. Day used the charge card to pay the electric bill for the Days' primary residence, D. 53 at 9; D. 53-11 at 88; D. 53-16 at 18; D. 54 ¶ 15, and used Rival's Jet Blue Card and bank account to pay for utilities and landscaping services for their properties through May 2019.  D. 53 at 9; D. 53-16 at 16-19; D. 53-11 at 88, 93, 96; D. 53-12 at 15; D. 53-11 at 136; D. 54 ¶ 16.

Following Rival's separation from NuVasive, the Days continued making personal purchases using Rival's funds.  For instance, on April 9, 2019, Ms. Day used Rival's card on a family trip.  D. 53 at 9; D. 53-16 at 20; D. 53-11 at 97; D. 54 ¶ 17.  Between April and May 2019, Day used Rival's card to make personal purchases.  D. 53 at 9; D. 53-11 at 96, 98, 100; D. 54 ¶ 17.  Day then used Rival's Bank of America account to pay off the final $4,937.56 balance on Rival's card.  D. 53 at 10; D. 53-11 at 102, 134; D. 54 ¶ 18.

2.       *Use of Rival's Bank of America Account*

Day also used funds in Rival's Bank of America account for personal transactions after Rival separated from NuVasive.  D. 53 at 10.  Day made such transactions using Rival's Bank of America account in April to August 2019.  D. 53 at 10; D. 53-11 at 130, 134, 136; 142; D. 54 ¶ 19.  In addition, Day wrote two checks from Rival's account to Blue Cross Blue Shield of Massachusetts to pay for his family's health insurance in July 2019.  D. 53 at 10; D. 53-11 at 45, 148; D. 54 ¶ 20.

## IV.    Procedural History

Plaintiff NuVasive instituted this action on October 8, 2021.  D. 1.  Both Defendants and NuVasive have now moved for summary judgment.  D. 48; D. 76.  NuVasive also moved for sanctions for spoliation of evidence.  D. 78.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 85.

## V.     Discussion

### A.     Piercing the Corporate Veil and Alter Ego Liability (Counts I and II)

Under Massachusetts law, corporations and their shareholders are ordinarily deemed to be distinct legal entities.  See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968).  "Under unusual circumstances, however, a court may disregard the separateness of entities, particularly to defeat fraud or remedy an injury."  In re Blast Fitness Grp., LLC, 603 B.R. 219, 245 (Bankr. D. Mass. 2019) (citation omitted).  "These efforts are often characterized as veil piercing or establishing alter ego status."  Id.  "Although the standards for piercing the corporate veil are articulated most frequently with respect to corporations, . . . the same principles would apply for alter ego liability to attach to members of limited liability companies."  In re Wolverine, Proctor & Schwartz, LLC, 447 B.R. 1, 36 (Bankr. D. Mass. 2011). "The doctrines of veil piercing

. . . and alter ego are interrelated and litigants often use the terms interchangeably." In re Raymond, 529 B.R. 455, 471 (Bankr. D. Mass. 2015).

Although NuVasive pleads separate counts for piercing the corporate veil and alter ego liability, the parties' arguments for both counts rely upon the same analysis.  D. 48 at 16; D. 77 at 8, 11.  Accordingly, the Court addresses these counts together.  Regardless of which theory is applied, departing from the general principle of corporate separateness is appropriate  where" (1) there is active and pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequence by reason of the relationship among those business entities;" or "(2) there is a 'confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'"  Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 732-33 (1991) (emphasis in original) (quoting My Bread, 353 Mass. at 620); see Concepts NREC, LLC v. SoftInway, Inc., No. 19-cv-12033-IT, 2021 WL 916259, at *3 (D. Mass. Mar. 10, 2021) (describing finding of alter ego).  Relevant factors as to whether such action is warranted include:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Att'y Gen. v. M.C.K., Inc., 432 Mass. 546, 555 n.19 (2000) (citing Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14–16 (1st Cir. 1985)); see Birbara v. Locke, 99 F.3d 1233, 1240 (1st Cir. 1996) (stating that "My Bread sets the standard for deciding when to pierce the corporate

veil under Massachusetts law" and "<u>Pepsi-Cola</u> elucidates some factors that may be considered when engaging in a <u>My Bread</u> analysis").  The weighing of these factors is not an exercise "in counting."  <u>Evans</u>, 30 Mass. App. Ct. at 736.  These factors are instead "considered in their totality based on the facts presented."  <u>Scallop Imaging, LLC v. Vision Techs., Inc.</u>, No. 17-cv-10092-ADB, 2021 WL 3561213, at *6 (D. Mass. Aug. 12, 2021) ("<u>Scallop III</u>").

Defendants urge that the doctrine of corporate disregard "is rarely, if ever, applied in contractual disputes and is generally reserved for tort actions."  D. 48 at 8.  While "[s]everal courts and commentators have suggested that it should be more difficult to pierce the veil in a contract case than in a tort case," <u>Birbara</u>, 99 F.3d at 1238, "piercing the corporate veil is not, as a matter of law, unavailable in contract cases."  <u>Scallop III</u>, 2021 WL 3561213, at *9 n.25.  As such, the Court exercises its discretion in applying the equitable doctrine of corporate disregard in this case for the purpose of resolving the pending motions for summary judgment.[3]

1.  *Analyzing the <u>Pepsi-Cola</u> factors for corporate veil piercing and/or alter ego*

<u>Nonobservance of corporate formalities.</u>  Rival observed at least some corporate formalities as it filed a certificate of organization, annual reports with the Secretary of the Commonwealth and annual tax returns at least in 2016 to 2019, and maintained a separate bank account, separate credit card, and financial records.  <u>See</u> <u>George Hyman Constr. Co. v. Gateman</u>, 16 F. Supp. 2d  129, 153 (D. Mass. 1998) (noting that "some of the more noticeable" corporate

---

[3] Defendants note that NuVasive chose to contract with Rival and not Day individually.  D. 48 at 16.  Although this fact does not foreclose the Court's application of the corporate disregard doctrine, the Court has considered the particularities of a contract-based relationship, given the particular circumstances presented here, in its analysis.  <u>See</u> <u>OMV Assocs., L.P. v. Clearway Acquisition, Inc.</u>, 82 Mass. App. Ct. 561, 567 (2012) (opining that "a contract-based relationship, where the parties are plainly identified and their rights and obligations clearly defined, is less likely to present the sort of rare situation that calls for corporate disregard in order to prevent gross inequity").

formalities include filing tax returns, certificates of condition, and annual reports, filling out articles of organization and certificates of change of officers, and keeping separate bank accounts and payroll accounts); see Evans, 30 Mass. App. Ct. at 734 (concluding that corporate formalities were observed where the company used its own funds to pay employees and filed separate tax returns and annual certificates of condition).

*Absence of Corporate Records.*  Even concluding that Rival observed some corporate formalities, it maintained no operating agreement, minutes from annual meetings or board resolutions approving company acts.  Defendants insist that the only corporate records Rival was required to keep included the initial organization records, annual registrations, name change and dissolution records.  D. 48 at 14.  In addition to the filing of an initial certificate of organization, Mass. Gen. L. c. 156C § 12(b), Massachusetts LLCs are required to file an annual report with the state secretary.  Id. § 12(c).  The Act defines "operating agreement" as "any written or oral agreement of the members as to the affairs of a limited liability company and the conduct of its business."  Id. § 2(9).  Although it appears that an operating agreement is "optional rather than mandatory."  Carter G. Bishop, Unincorporated Limited Liability Business Organizations: Limited Liability Companies and Partnerships, 29 SUFFOLK U. L. REV. 985, 1033 (1995) (citing Mass. Gen. L. c. 156C § 2(9)), the Commonwealth's LLC Act contemplates, that "unless contained in a written operating agreement," that there be some "writing" that sets out the amount of cash and statement of agreed value of property contributed by each members, the times at which additional contributions would be made; the right of member to receiver or a manager to make distributions to a member of the LLC and "any events upon the happening of which the [LLC] is to be dissolved and its affairs wound up."  Mass. Gen. L. c. 156C § 9(5).  It appears from this record that Rival had no such written memorialization.

In <u>Hyman</u>, the corporate records "were no model of corporate governance" because, for instance, "there were no corporate minutes." <u>Hyman</u>, 16 F. Supp. 2d at 154. However, the court determined that the "records did, at a minimum, exist, and the check registers, the profit and loss statements and… ledgers indicate at least some good faith effort to maintain accurate records." <u>Id</u>. <u>Hyman</u> further clarifies that the legal question "is not whether [the Company's] records were adequate but whether, for the purposes of corporate legitimacy, they actually existed." <u>Id</u>. Here, the undisputed facts show that, Rival maintained the minimal records of corporate governance: a certificate of organization, D. 48-1, the filing of annual reports with the state secretary from 2014-2018, D. 48-2, and tax returns for the three most recent years, D. 48-5. Rival also maintained financial records, D. 48-8, even as NuVasive contends that those records revealed Day's commingling of its funds with his own and personal use of same, as discussed further below.

*Payment of Dividends.* NuVasive contends that Rival showed no evidence of ever having paid dividends. D. 53 at 11. In response, Defendants argue that Day opted to draw a salary as opposed to taking distributions, D. 57 at 5; <u>see</u> <u>Evans</u>, 30 Mass. App. Ct. at 735 (stating that "gain may take the form other than the payment of dividends or distributions to stockholders. So it is that in closely held corporations, a stockholder's reward may be employment by the corporation, thereby to earn a salary, bonus, or retirement benefit"). Still, "corporations in the normal course should be paying dividends, or at a minimum making conscious decisions not to do so." <u>Hyman</u>, 16 F. Supp. 2d at 154. Such was not the case here as Rival paid no dividends and there is no indication, in written form or otherwise, of a conscious decision not to do so by this LLC.

*Thin Capitalization.* There is no dispute that Day capitalized Rival, at least in January 2019, with a $15,000 investment. Instead, the parties dispute whether the $15,000 investment was sufficient as this factor focuses on whether the capital was "too thin." <u>See</u> <u>Evans</u>, 30 Mass. App.

Ct. at 734.  That is, whether the "company was given the 'up-front financing needed' to perform its work, and whether, '[d]uring its active corporate life,' the company 'want[ed] for assets.'" Supply Chain Assocs., LLC v. ACT Elecs., Inc., No. MICV200802214, 2012 WL 2381908, at *11 (Mass. Super. Mar. 29, 2012) (quoting Evans, 20 Mass. App. Ct. at 734).  "The legal touchstone for adequacy of capital in a veil-piercing case is directed at whether a corporate entity was or was not set up for financial failure," Hyman, 16 F. Supp. 2d at 152, "within the context of the relevant corporate purposes and activities."  De Castro v. Sanifill, Inc., 198 F.3d 282, 284 (1st Cir. 1999).

NuVasive argues that Day intentionally undercapitalized Rival at the outset, D. 77 at 13, and Defendants assert that Rival was not initially set up for financial failure.  D. 57 at 4.  NuVasive asserts that upon commencement of the Distributorship Agreement, Rival's business changed in scope, making it for the first time responsible for paying employees, payroll taxes and employee benefits, yet Rival failed to infuse sufficient funds to avoid short-term difficulties.  D. 53 at 12.

Rival was too thinly capitalized.  The $15,000 investment was insufficient to pay one employee's yearly salary, let alone the fifteen that Rival employed.  As the undisputed evidence shows, Rival did not even have the funds to cover just one month of all employees' salaries following Rival's separation from NuVasive.  D. 53 at 12; D. 54 ¶ 25; see, e.g., Vuylsteke v. Broan, 172 Or. App. 74, 78 (2001) (concluding that there was gross undercapitalization where defendant failed to capitalize a company and that company was responsible for "plaintiff's salary, her bonus and the [company]'s operating costs").  It is also fair to infer from the record, that Rival would have had other business costs beyond salaries, including employer contributions to medical and dental insurance plans, company taxes, and miscellaneous day-to-day operating costs.  These expenses could not have been covered with the capitalization provided, and the $15,000 investment was an insufficient amount to guarantee even the short-term sustainability of the company,

especially given the increased scope of the work upon entering the Distributorship Agreement with NuVasive.  See AG v. M.C.K., Inc., 432 Mass. 546, 555 & n.21 (2000) (affirming the piercing of the corporate veil where, among other factors, the corporation was too thinly capitalized); see In re Stamou, No. 8-09-78895-REG, 2013 WL 209473, at *8 (Bankr. E.D.N.Y. Jan. 17, 2013) (piercing the corporate veil where, among other factors, the LLC "was not adequately capitalized").

Insolvency at the time of the litigated transaction.   The test for finding insolvency is whether a corporation "experienced difficulty in paying debts as they became due."  Evans, 30 Mass. App. Ct. at 735; see Birbara, 99 F.3d at 1241.  "The 'time' considered for the test of insolvency is not a single point in time but rather the duration of the contested transactions between the parties."  Hyman, 16 F. Supp. 2d at 154 (citations omitted).   It is undisputed that Rival is insolvent.  Rival operated at a net loss in 2018, prior to the start of the Distributorship Agreement with NuVasive in January 2019.  D. 48-5 at 19.  NuVasive initiated the arbitration on April 30, 2019.  NuVasive, No. 19-cv-10800-DJC (D. Mass. Aug. 19, 2020), D. 156-7.  By that time, Rival was already experiencing difficulty paying its debts, as it did not have sufficient funds to pay its salespersons the salaries and commissions earned in March of 2019.  D. 53 at 12; D. 53-12 at 8; D. 54 ¶ 25.  As of at least September 1, 2019 (well before the Arbitration Award in December 2020), Rival's bank account reflected no assets and held a balance of $0.  D. 48-6 at 11; see Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 195 (3rd Cir. 2003) (concluding that finding of insolvency weighed in favor of piercing the corporate veil).

Nonfunctioning of officers and directors.   To evaluate this factor, courts have looked to whether the individuals have functioned "actively" in their capacities as officers and directors.

Evans, 30 Mass. App. Ct. at 736; Hyman, 16 F. Supp. 2d at 156.  As to this factor, Defendants contend that Ms. Day, although not a member or officer or director of Rival, was Rival manager and was "an active participant in certain aspects of the business." D. 57 at 6.  Although Defendants acknowledge that her duties were limited to administrative tasks, id.; D. 77-7 at 4, she also had little knowledge of Rival's operations, i.e., whether she or Day contributed assets to Rival, was not involved in its financial affairs and did not know if Rival maintained any bank accounts or credit cards.   D. 53-16 at 8-9.  She also never exercised any decision-making power over Rival, signed any contracts or entered into any agreements on behalf of the company, nor participated in any meetings or votes of the company.   Id. at 10-11.  This lack of knowledge and lack of participation in the business decisions of the company indicate that Ms. Day was not functioning "actively" in her designated capacity as the manager of Rival.

 *Commingling of business assets.* To evaluate this factor, courts have looked to the financial separateness and independence of the corporate entity from its shareholders.  See Pepsi-Cola, 754 F.2d at 14, 17 (concluding that confused intermingling existed where funds of the company and the officers and directors were commingled and the company made expenditures, such as paying dental bills, health and life insurance not reported as employee benefits, and residential telephone service on behalf of the officers and directors of the company).

 NuVasive alleges that the Days commingled Rival's assets with their own.  First, NuVasive shows that in 2016 and 2017, while Rival did business for Magellan, NuVasive's former distributor, Magellan paid commissions earned by Rival directly into the Days' personal checking account.  D. 53-14; See Hyman, 16 F. Supp. 2d at 152 (concluding that individual shareholders' receipt of direct payment of cash from a transaction, "the proceeds of which should probably have gone to [the company,]" supported a finding of intermingling of personal and corporate assets).

Although the <u>Hyman</u> court indicated that this "standing alone" was not enough to establish commingling, <u>id.</u>, the Court notes that here, Day received Rival's commission to his personal bank account every month for two years, which is significantly more indicative of commingling than the sole transaction in <u>Hyman</u>.  D. 53-14.  Moreover, other evidence identified by NuVasive also indicates that commingling was pervasive.

For instance, Day's mother was on Rival's payroll and received a salary despite her questionable role as an employee of the company.  D. 53-11 at 68.  Day testified that his mother did "some bookkeeping" for Rival, but he has no record of such bookkeeping and does not recall if Lisa Day was on payroll solely for purposes of being on its insurance plan.  D. 53-11 at 27-28.

NuVasive also points to various transactions to show that the Days improperly used Rival's funds for their own personal affairs.  D. 54 ¶¶ 13-21.  Defendants argue that these "isolated" instances are only a small fraction of the transactions.  D. 57 at 6.  They further argue that these transactions "appear business-related for travel, meals, and client entertainment."  D. 83 at 11 & n.3.  Defendants, however, do not present evidence to show  that any of these transactions (whatever percentage of the total Rival transactions that they may have been), including the purchase of consumer goods and utilities and other services for a vacation residence, were connected to Rival's business.  <u>See</u> <u>Travers</u>, 737 F.3d at 146 (requiring more than "conclusory allegations, improbable inferences, and unsupported speculation … to establish a genuine dispute of fact").  Moreover, no reasonable factfinder could conclude, however, that all of the transactions NuVasive identified were business-related.  For instance, the numerous charges to an online shoe store, utility bills to the Days' properties, landscaping services to the Days' vacation home, a family vacation and meal preparation services suggest ongoing improper use of Rival's funds for the Days' personal affairs.  D. 54 ¶¶ 15-17; <u>see</u> D. 53-16 at 16-20.

*Siphoning away of corporation's funds by dominant shareholder.*  To find asset siphoning, the Court must look to a "willful depletion of corporate assets."  Hyman, 16 F. Supp. 2d at 155. Following the split from NuVasive, which happened no later than April 1, 2019, the Days continued using Rival's credit card to make purchases.  Numerous of the transactions that do not appear to be business-related took place after Rival stopped its services.  D. 53-11 at 96-100.  The balance on this card was paid in full on May 23, 2019 using Rival's bank account.   D. 53-11 at 102, 134.  That same day, Day sent an email to his accountant stating that he "need[ed] to deplete the Rival Business account."  D. 53-11 at 80.  In the following months, Day made various cash withdrawals, D. 53-11 at 130, 134, 146, 152, and continued to write additional checks, despite Rival having ceased doing business.  See, e.g., D. 53-11 at 148; D. 84 at 5.

*Pervasive Control.*  NuVasive argues that Day exercised pervasive control over Rival because Day controlled all facets of Rival.  In part, it relies upon the fact that, in the Related Litigation, Day took the position that he and Rival were "indistinguishable" and should be considered one and the same, or alter egos, and thus Day could not tortiously interfere with his own contract.  D. 53 at 5.  This Court in the Related Litigation decided that there was evidence "for concluding that Day should be viewed as Rival's alter ego," but that NuVasive's tortious interference claim otherwise failed on other elements.  NuVasive, Inc. v. Day, No. 19-cv-10800, 2021 WL 1087982, at *5 (D. Mass. Feb. 18, 2021).

The alter ego analysis in a tortious interference claim is different from the alter ego analysis for piercing the corporate veil.  See Stello v. Ark Eng'g & Tech. Servs., Inc., No. 15-10590-PBS, 2015 WL 4254080, at *2 (D. Mass. July 14, 2015) (stating that "[u]nder Massachusetts law, corporations and individual defendants are 'indistinguishable' when the individuals are the corporation's 'sole stockholder'" for the purposes of analyzing a tortious interference claim ).  In

the Related Litigation, the Court did not make a finding of Day's alter ego's status, but noted there was a stronger case for concluding same and, certainly Day argued that he was the alter ego of Rival for the purposes of defeating the tortious interference claim there.  NuVasive, Inc. v. Day, 2021 WL 1087982, at *5.  The conclusion there does not require a finding of his alter ego status here, but the present record and Day's arguments in support of his alter ego status in the Related Litigation lend further support to the determination here that Day exercised pervasive control over Rival.  The undisputed facts show that Day was the sole member of Rival and controlled the affairs of Rival, including making decisions on behalf of the company.

Defendants contend that a finding of pervasive control for every single-member LLC would be contrary to the liability protections afforded to members in a limited liability corporation. The Court's conclususion here, however, is not so broad given the particular circumstances here. Moreover, "pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities," and "a showing of improper conduct" must also be present.  Scott, 450 Mass. at 768; see Gordon Chem. Co. v. Aetna Cas. & Sur. Co., 358 Mass. 632, 638 (1971); see also Malaro v. Wilkie, 640 F. Supp. 3d 192, 196 (D. Mass. 2022).

*Use of the corporation in promoting fraud.*  Promotion of fraud "may be found if a corporation 'was established or operated so as to misrepresent or divert assets.'"  Hyman, 16 F. Supp. 2d at 156 (emphasis in original) (quoting Evans, 30 Mass. App. Ct. at 736).  Fraud in this instance "is something less than a showing of fraudulent intent, which is not required for piercing under Massachusetts law."  Id.; see Evans, 30 Mass. App. Ct. at 736 (concluding that this factor was not met where there was "no evidence warranting a finding that [the corporation] was established or operated so as to misrepresent or divert assets").

17

As previously discussed, Day undercapitalized Rival so that the company could not reasonably have been expected to meet its obligations.  Day's $15,000 investment was not sufficient to ensure the financial success of the company and did not suffice to meet the company's operating costs and obligations to its employees, including payment of salaries and benefits.  After Rival stopped any services for NuVasive, Day used Rival's business credit card for personal transactions.  D. 54 ¶¶ 15-17.   Day expressed his intention to deplete the assets of the company, D. 53-11 at 80, and ultimately did deplete those funds (showing zero balance as of September 1, 2019).  D. 48-6 at 11.

Finally, Day acted in a blameworthy manner by causing Rival to breach the Distributorship Agreement and disregarding his non-compete obligations.  NuVasive points to communications showing that, during his engagement with NuVasive, Day was in negotiations with Alphatec.  D. 77-5 at 17-19.  Day was aware of his non-compete obligations to NuVasive, and as he was planning his departure from NuVasive and his transition to Alphatec, Day and Miles specifically discussed the non-compete obligations during a March 11 meeting.  D. 77 at 16; D. 77-5 at 21; see D. 77-5 at 18.   A few weeks later, Day asked NuVasive's in-house counsel about his non-compete obligations, claiming his accountant needed the information for tax purposes.  D. 77 at 16; D. 77-5 at 24.   A few days later, Day had Rival stop performing services for NuVasive (thereby breaching the Distribution Agreement).  D. 48 at 3; D. 53 at 13.  Following Rival's separation from NuVasive, Day used his Rival email address on or about May 1, 2019 to negotiate a sale of Alphatec products, which NuVasive argues was an attempt to avoid his non-compete obligations to NuVasive.  D. 53-11 at 107; D. 84 at 6.

After the breach, Day also created a new business, Maverick, designed to, like Rival, sell and distribute medical products.   D. 53-20; 53-18.   Day began doing business through this

company, D. 53-19, and Alphatec is one of the companies with which Maverick contracts.  D. 53-11 at 6.  All of these facts suggest, at the very least, that Day acted in a blameworthy manner and used Rival to promote a fraud on NuVasive by seeking to avoid his own non-compete obligations to the company, NuVasive, 2021 WL 1087982, at *3-6, 8, and evade legal responsibility for Rival's breach of the Distribution Agreement.

The balance of these Pepsi-Cola factors weigh in NuVasive's favor.  Even so, a party seeking to disregard the corporate form must also "show that piercing of the corporate veil is necessary to defeat fraud or wrong or to prevent a gross inequity."  Omni-Wave Elecs. Corp. v. Marshall Indus., 127 F.R.D. 644, 646 (D. Mass. 1989) (citation omitted).

This is the "rare" case in which piercing the corporate veil is warranted.  My Bread Baking Co., 353 Mass. at 620.  The undisputed record shows that Day decided to have, and then caused, Rival to breach the Distributorship Agreement with NuVasive.  Day was aware that following this breach, litigation was imminent, as communicated by NuVasive on April 2, 2019.  D. 54-1 at 2.  Despite this, Day proceeded to deplete Rival's assets until Rival had no more funds left in its account.  Prior to establishing a new distribution business, Maverick, Day emailed his accountant "to set up a new business," which should "be done in the same manner as Rival medical," with the purpose of "selling and disrupting [sic] medical products."  D. 53-20.  Rival is now insolvent, Day has been able to evade responsibility for satisfying the Arbitration Award.  Piecing the corporate veil, therefore, is necessary to defeat a wrong and prevent gross inequity.  Accordingly, the Court denies Defendants' motion for summary judgment on Counts I and II and allows NuVasive's motion for summary judgment on these counts.

### B.    <u>Fraudulent Transfer (Count III)</u>

Defendants also move for summary judgment on Count III, the fraudulent transfer count.  The Massachusetts Uniform Fraudulent Transfer Act allows a creditor to bring a claim of

fraudulent transfer, "whether the creditor's claim arose before or after the transfer was made or the obligation incurred," if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."  Mass. Gen. L. c. 109A, § 5(a)(1).  In determining actual intent, the following factors may be considered:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id., § 5(b).  A creditor may also bring a claim if the debtor made the transfer "without receiving a reasonably equivalent value in exchange," and "reasonably should have believed that he would incur debts beyond his ability to pay as they came do."  Id., § 5(a)(2)(ii).  In short, to prevail on a fraudulent transfer claim, NuVasive must demonstrate (1) that it is a creditor and (2) that Defendants fraudulently transferred the property.  Alford v. Thibault, 83 Mass. App. Ct. 822, 827 (2013).

Defendants contend that "the evidence reflects" that no assets, accounts or the like were improperly transferred out of Rival.  D. 48 at 18.  In support of this assertion, they cite to Rival's general ledger and bank statements to show that they reveal no fraudulent transfers.  Id. (citing D. 48-6, 48-8).  Defendants do not specify further which particular facts or transactions in these documents show a lack of a fraudulent transfer, and the Court "will not ferret through the record and 'study all the attached documents, and carefully scrutinize all the depositions lurking for [the absence of] genuine issues of material facts" to meet the Defendants' burden.  Arce v. ARAMARK

Corp., 239 F. Supp. 2d 153, 158 (D.P.R. 2003) (quoting Dominguez v. Eli Lilly & Co., 958 F. Supp. 721, 727 (D.P.R. 1997)).

In addition, NuVasive has presented evidence to support their assertion that Defendants transferred assets with the intent to hinder, delay, or defraud.  For instance, NuVasive first asserts that it is a creditor and that its claim, which ultimately resulted in the Arbitration Award, arose prior to the transfers at issue in this litigation. D. 53 at 18-19.  It also asserts that on April 1, 2019, the day by which Rival stopped operating, Rival's bank account held $18,101.79, which later dwindled to $0.  Id. at 19.  NuVasive claims that Day effectuated several transfers from Rival to pay personal expenses, and that after April 1, 2019, most of Rival's assets transferred to the Days. Id.  NuVasive further argues that Day was an insider because he controlled all facets of Rival.  Id. Finally, NuVasive asserts that all the transfers at issue occurred immediately after Rival separated from NuVasive and after NuVasive filed suit.  Id.  Accordingly, NuVasive has at least established that there is a dispute of material facts as to the relevant factors.  Because Defendants failed to establish that there is no genuine issue of material facts as to whether a fraudulent transfer took place, the Court denies Defendants' motion for summary judgment on Count III.

### C.    NuVasive's Spoliation Motion

NuVasive has filed a motion for the alleged spoliation by Day of text messages that he had with Alphatec in late 2018 and early 2019.  D. 78.  These allegations concern text messages that he had with Miles on a "concealed device" that were not produced in the Related Litigation or this case, but came to counsel's attention from another case.  D. 79 at 7-8.  Such text messages (which certainly constitute "communications") were responsive to at least one document request in this litigation that sought all communications with Alphatec regarding Rival's formation, operations, cessation of operations or dissolution from January 1, 2018 forward.  D. 79 (Document Request

#16).  As sanctions for same, NuVasive seeks an adverse inference in its favor against Defendants pursuant to Fed. R. Civ. P. 37(e)(2).  The Court DENIES this relief as moot in light of its ruling, on the merits, as to NuVasive's motion for summary judgment as to Count I and II.  As to the portion of the motion that seeks reasonable costs and expenses, including reasonable attorneys' fees incurred in securing this relief, D. 79 at 20, the Court ALLOWS D. 78 in this regard.  Without repeating all of what NuVasive has argued in its memorandum, the Court concludes that the text messages should have been preserved in anticipation of litigation (of which Day was on notice as of April 2, 2019, D. 54-1 at 2), and he, at a minimum, failed to take reasonable steps to preserve them.  Although NuVasive, with no assistance from Defendants, was able to get copies of the text messages from this other device, NuVasive has at least suffered harm in the necessity of filing this motion.  See D. 79 at 19 and cases cited.  Accordingly, the Court will consider the award of reasonable costs and attorneys' fees for the filing of such motion in connection with the final order of judgment in this case.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment, D. 48, and ALLOWS NuVasive's motion for partial summary judgment as to Counts I and II, D. 76.  The Court also ALLOWS NuVasive's motions for sanctions, D. 78, in part and DENIES it in part.

**So Ordered.**

/s Denise J. Casper
United States District Judge